UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


WAYNE PATTERSON,

          Plaintiff,

v.                                    Civil Action No. 12-01964

MAGISTRATE JULIE YEAGER,
individually,
LIEUTENANT R.T. YEAGER,
individually and in his
official capacity,
SERGEANT L.S. THOMAS,
individually and in his
official capacity, and
OFFICER R.P. MCFARLAND,
individually and in his
official capacity,

          Defendants.


MEMORANDUM OPINION AND ORDER


          Pending are the parties' cross-motions for summary
judgment, filed by: defendant Magistrate Julie Yeager on
December 2, 2015; defendants Lieutenant R.T. Yeager, Sergeant
L.S. Thomas, and Officer R.P. McFarland (collectively, "the
police defendants") jointly on December 2, 2015; and plaintiff
Wayne Patterson ("plaintiff") on December 3, 2015.  Also pending
is plaintiff's motion to strike the sworn statement of Gail
Reid, filed on December 21, 2015.

## I. Factual background

### A. The events of June 29, 2011

Josephine Patterson died intestate on March 26, 2011. See Wayne Patterson Affidavit of August 15, 2012 ("Patt. Aff."), ¶ 15. She was survived by four children, all grown -- plaintiff, his brother George Patterson, and their sisters Gail Reid and Alzerita Munlin. Patt. Dep. 18:11-17. In life, Josephine owned a house on Barrett Street in South Charleston, West Virginia ("the Barrett Street house," or "the house"). Patt. Aff. ¶ 5. The house is at the center of this case.

Of the four siblings, only Gail lived in the Charleston area, in an apartment not far from the Barrett Street house. Reid Statement 7:19-20, 10:3-16. After Josephine died in South Carolina, where she had been living with or near George for the year prior, Reid Statement 9:8-12, the house remained unoccupied, though it was fully furnished, Reid Statement 9:20-23. Having been advised by the South Charleston police that it was unwise to leave the house unoccupied, Reid Statement 9:20-10:11, Gail invited her daughter Danaya, along with Danaya's husband Joe Steiner and their children, to live in the house, Reid Statement 11:22-12:7. It appears that Danaya and her family moved into the house in the late spring of 2011. Soon after, Gail invited Jaime Adkins, a friend of Danaya's, to stay

2

at the house while she started a new job in the area.  Adkins
Dep. 93:10-94:22; Adkins Letter, p. 1.  Danaya, Joe, Gail, and
Jaime are collectively referred to in this memorandum opinion as
"the Reid group."

        Plaintiff was living in Illinois when his mother died,
and had been for some time.  Patt. Aff. ¶ 2; Patt. Dep. 15:14-
15.  In late June of 2011, plaintiff travelled to South
Charleston after getting a report that someone had broken into
the Barrett Street house.  Patt. Dep. 22:20-21.  The break-in
report came from plaintiff's brother George, who in turn had
"received a telephone call informing [him] that [Gail's daughter
Danaya] had broken into the house[.]"  Patt. Dep. 68:8-69:70;
George Patterson Affidavit ("George Patt. Aff."), ¶ 9.  The
person who called George has not been identified.

        On June 29, 2011, plaintiff, George, and plaintiff's
teenaged son Eros (collectively, "the Patterson group") met in
the parking lot of a convenience store not far from the Barrett
Street house.  Patt. Dep. 37:4-38:4.  Their goal: to "occupy,
secure, and protect the house and its contents."  George Patt.
Aff. ¶ 10.  Before they went to the house, though, George called
the South Charleston Police Department's dispatch line and asked
for a police officer to meet them there.  Patt. Dep. 37:10-
38:18; George Patt. Aff. ¶ 15; see also CAD Operations Report,

3

Compl. Ex. 2, p. 1.  During the call, George professed to be concerned that the "prev[ious] tenants" were still living there. CAD Operations Report, p. 1.

South Charleston police officer A.R. Lindell responded to the call and was waiting outside the house for the three of them when they arrived.  Patt. Dep. 31:14-24.  Plaintiff and George told Officer Lindell that "this is our house," and that they had "come here because our niece [Danaya] broke into the house and was planning to occupy it . . . against our will."  Patt. Aff. ¶¶ 15-16.  Plaintiff added that they "were concerned and afraid that Danaya would say that [she] was assaulted . . . in an effort to gain an advantage in taking our house."  Patt. Aff. ¶ 16.  It turned out that the house was locked, and plaintiff's key didn't work, so plaintiff had Eros crawl through a window and unlock the door from inside while Officer Lindell observed.  Patt. Dep. 31:14-24, 63:15-67:24; Patt. Aff. ¶ 18. Nobody was home, but inside the house plaintiff noticed signs of recent occupation, including "pizza on the bathroom floor" and cigars bearing the "very smelly" aroma of marijuana.  Patt. Aff. ¶¶ 19-23.

While the Patterson group was inside with Officer Lindell, Jaime Adkins arrived home by car and saw that two unfamiliar civilian cars and one police car were parked outside

4

the house.  Adkins Dep. 97:5-98:4.  Concerned, she called Gail
who told Jaime that "it was probably [Gail's] brother" and asked
Jaime to come get her, which Jaime did.  Adkins Dep. 97:17-22.
Gail and Jaime then drove back to the house, by which time
Officer Lindell had departed.  Adkins Dep. 97:24-98:3.

Gail and Jaime entered the house together and found
the Patterson group within, whereupon the two groups quarreled.
Patt. Aff. ¶¶ 26-27.  Someone called the police, Patt. Aff. ¶
27; Adkins Dep. 98:17-21, and Jaime retreated outside, Adkins
Dep. 98:19-24.  When the police arrived, Gail and Jaime accused
plaintiff of attacking them with a baseball bat, shoving and
choking Gail, and pushing Jaime to the ground while she was
holding the infant Dylan, whom she dropped.  Patt. Aff. ¶¶ 26-
27; Adkins Letter, p. 1.  After speaking with plaintiff and Gail
inside the house, the police ordered Gail, Jaime, and Joe
(Danaya's husband, who by then had also arrived) to vacate the
premises forthwith, which they did, leaving their various
possessions behind.  Patt. Aff. ¶¶ 29-32; Adkins Dep. 99:13-23.
Gail Reid later claimed that plaintiff used a "fake power of
attorney" to convince the police on June 29 that his right of
possession was superior and that the Reid group were
trespassers.  See Reid Statement 17:20-18:17 ("[T]hey were
taking the Power of Attorney -- like you know okay, this is

their right. . . . And you know that's what he was saying.
[']They're not supposed to be here.[']").  The Patterson group
then spent June 29 and 30 in the house.  Patt. Dep. 42:21-43:12;
Adkins Letter, pp. 2-3.  On July 1, the police kicked them out.

## B.  The events of July 1, 2011

On July 1, two days after the Reid group had been
removed from the house, South Charleston police lieutenant R.T.
Yeager ("Lieutenant Yeager") telephoned the Kanawha County
Magistrate Court, where he spoke to Magistrate Julie Yeager.
Mag. Yeager Dep. 23:1-22.  Lieutenant Yeager asked her whether
"there were any orders that would have removed anyone from the
[Barrett Street] residence," such as a "wrongful occupation
order or a domestic violence protective order."  Mag. Yeager
Dep. 23:22-24:20.  During the conversation, Magistrate Yeager
volunteered that plaintiff had been to the magistrate court on
June 29, 2011, and that she had spoken with him about the
Barrett Street house and Josephine Patterson's estate.  Mag.
Yeager Dep. 24:1-25:23.  Gail, who was present during the call,
remembers Magistrate Yeager telling Lieutenant Yeager, in
apparent reference to plaintiff, that "he should not be in that
house."  Reid Statement 18:22-24.

Around the same time on July 1, Jaime "received a
phone call from Danaya stating that [the Reid group] had been

6

asked to meet the SCPD at their station at 3:00 p.m. because [the police] planned to remove [the Patterson group] from [the] house." Adkins Dep. 30:12-24. Jaime felt that "it was really strange how [the police] simply changed their mind[s.]" Adkins Letter, p. 3. Nevertheless, that afternoon she met the rest of the Reid group, including Gail, and Lieutenant Yeager at the police station. See Lt. Yeager's Supp. Resp. to Plaintiff's First Request for Admissions, Supp. Resp. # 11; Adkins Dep. 34:2-20; Adkins Letter, pp. 2-3. From there, they drove to a location near the Barrett Street residence, where they rendezvoused with Sergeant Thomas and Officer McFarland. Adkins Dep. 35:23-37:7.

Once at the house, Lieutenant Yeager, Sergeant Thomas, and Officer McFarland entered through an unlocked door, accompanied by Danaya. Patt. Aff. ¶ 37; Patt. Dep. 90:1-91:22. Inside, Lieutenant Yeager "told [plaintiff, George, and Eros] to '[g]et out now, right now!'" Patt. Aff. ¶ 37; Patt. Dep. 88:1-94:5. Lieutenant Yeager's face was "very red," Reformed Second Amended Complaint ("Compl."), p. 2, and plaintiff "was afraid of him." Patt. Dep. 54:1-2. Plaintiff told Lieutenant Yeager "this is our house, sir," Patt. Dep. 44:14-16, 91:8-11, and "began to explain that [Danaya, Joe, and Jaime] had broken in [and] were not actually living there yet." Patt. Aff. ¶¶ 38-39.

7

In response, Lieutenant Yeager threatened to pepper spray plaintiff, "placed his hand on his belt," and "angrily stated '[d]on't come back inside!'"  Patt. Aff. ¶¶ 38-39; George Patt. Aff. ¶¶ 25-25.  Plaintiff, George, and Eros complied and left the house in haste.  Patt. Aff. ¶¶ 40-42.

## II. <u>Procedural background</u>

### A.

Plaintiff initiated this action on June 11, 2012. Then, as now, plaintiff was proceeding <u>pro</u> <u>se</u>, wherefore the matter was referred to a magistrate judge pursuant to 28 U.S.C. § 636 and standing order in this district.  At least in its present form, this civil action arises from the defendants' participation, directly or indirectly, in removing plaintiff from the Barrett Street house, as described above.

In the original complaint, plaintiff named as defendants the City of South Charleston, Lieutenant Yeager, South Charleston police officer T.A. Bailes, and seven other, unidentified South Charleston police officers.  Those defendants jointly moved to dismiss the complaint on July 23, 2012. Magistrate Judge Stanley issued her proposed findings and recommendation ("PF&R") on October 30, 2012, in which she recommended that the defendants' motion to dismiss be granted.

Plaintiff filed timely objections to the PF&R, and also sought leave to amend the complaint.  In its order of March 29, 2013, the court adopted the magistrate judge's PF&R and granted the defendants' motion to dismiss the original complaint.  However, the court granted in part plaintiff's motion to amend, specifically with respect to the claims for civil trespass proposed therein.

After several extensions of the discovery period, the parties filed cross-motions for summary judgment.  On October 11, 2013, Magistrate Judge Tinsley issued another PF&R, this time recommending that the court deny the parties' motions.  The court adopted the magistrate judge's recommendation on January 22, 2014.  Nine months later, on September 15, 2014, plaintiff sought leave to amend the first amended complaint.  The magistrate judge issued a PF&R on April 24, 2015, in which he recommended that the court permit plaintiff to do so.

The proposed second amended complaint consisted of 194 extremely cumbersome and prolix pages, and contained a great deal of redundant and immaterial matter.  The court struck the offending portions, pursuant to Rule 12(f)(1) of the Federal Rules of Civil Procedure, and entered the reformed second amended complaint on June 10, 2015.

The reformed second amended complaint -- now the operative complaint in this action -- contains eleven counts against four defendants, out of an original 179 counts against twenty-four defendants.  Specifically, the complaint consists of the following: (1) causes of action against the police defendants under 42 U.S.C. § 1983 for alleged violations of plaintiff's Fourth Amendment rights (relabeled as Counts One, Two, and Three, and found at paragraphs 246-48, 258-60, and 288-90 of the complaint); (2) causes of action against the police defendants for common law trespass (relabeled as Counts Four, Five, and Six, and found at paragraphs 468-71, 484-87, and 524-27); (3) causes of action against the police defendants and Magistrate Yeager under 42 U.S.C. § 1983 for conspiracy to violate plaintiff's Fourth Amendment rights (relabeled as Counts Seven, Eight, Nine, and Ten, and found at paragraphs 619-21, 631-33, 643-45, and 673-75); and (4) a cause of action against Lieutenant Yeager for common law assault (relabeled as Count Eleven, and found at paragraphs 692-94).

By its order of July 9, 2015, the court withdrew the aforementioned reference to the magistrate judge.  Discovery concluded as scheduled, after a forty-five day extension at plaintiff's request, on November 13, 2015.  Subsequently, on December 2, 2015, the defendants filed their respective motions

for summary judgment, and on December 3, 2015, plaintiff filed his.  Plaintiff also moves to strike all, or at least portions, of the sworn statement of Gail Reid submitted by the police defendants in support of their motion.

                                    B.

        The district courts of the United States "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The court is properly invested with original jurisdiction over plaintiff's section 1983 claims inasmuch as section 1983 is a federal statute through which deprivation of constitutional rights may be redressed.

        Pursuant to 28 U.S.C. § 1367(a), a district court properly invested with jurisdiction over one claim is empowered to exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy."  Because plaintiff's remaining state law claims are based on the same set of facts as his federal claims, supplemental jurisdiction over the remaining claims is warranted under section 1367(a).

                                    11

III.  <u>Standard governing summary judgment</u>

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>also</u> <u>News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.</u>, 597 F.3d 570, 576 (4th Cir. 2010) (same).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248. On the other hand, "[f]actual disputes that are irrelevant or unnecessary will not be counted."  <u>Id.</u>

The moving party has the initial burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party satisfies this burden, then the non-moving party must set forth specific facts, admissible in evidence, that demonstrate the existence of a genuine issue of material fact for trial.  <u>See</u> <u>id.</u> at 322-23; Fed. R. Civ. P. 56(c), (e).

12

When examining the record, the court must neither resolve disputes of material fact nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility, Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Along those lines, inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

At bottom, a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find for the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

## IV. <u>Plaintiff's motion to strike</u>

### A.

Plaintiff moves to strike the "sworn statement of Gail Lynette Reid," which was obtained by counsel for the defendants on November 13, 2015.  Inasmuch as the police defendants have submitted the sworn statement in support of their motion for summary judgment, the court first considers plaintiff's motion to strike.

Plaintiff contends that the sworn statement falls short of the "technical requirements for sworn statement[s]," "is not supported by decisional law," and "fails to meet any of the elements required by Rule 56."  Strike Mot., pp. 2, 4.  In his reply to the police defendants' response in opposition, plaintiff, for the first time, states a general objection to "pages 1-10, 12-18, 21-32, 34-40, 43-46, and 48-57" of the statement as being outside Gail Reid's personal knowledge, Reply, p. 2, while adopting some of her statements as supporting his position, Reply, pp. 5-6.  Plaintiff also objects to the admissibility of the sworn statement on the grounds that he was not present when it was taken.  Strike Mot., p. 5.

In their response, the police defendants maintain that the sworn statement may be considered at the summary judgment

14

stage, plaintiff's objections notwithstanding, because it is the "substantial equivalent of an affidavit under Rule 56(c)." Response, p. 4 (citing Curnow ex rel. Curnow v. Ridgecrest Police, 952 F.2d 321, 324 (9th Cir. 1991)).  The police defendants further contend that plaintiff's absence during the statement does not affect its admissibility as an "affidavit." Response, pp. 4-5.

### B.

As observed in the previous section, Rule 56(a) mandates summary judgment if "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Rule 56(c)(1)(A), in turn, provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . affidavits[,] or declarations. . . ."

Gail Reid's sworn statement was taken in the guise of a deposition, through questioning by counsel for the defendants. It is clear, however, that the statement cannot be used as a "deposition" as that term is defined in the Federal Rules of Civil Procedure.  To wit, Rule 32(a) provides that, "upon the hearing of a motion . . . any part or all of a deposition . . . may be used against any party who was present or represented at

the taking of the deposition or who had reasonable notice
thereof. . . ." Fed. R. Civ. P. 32(a)(1)(A).  Yet the police
defendants filed their "notice of deposition" electronically on
the morning of November 12, 2015, one day before the scheduled
date, and mailed plaintiff notice on the same day.  Perhaps
unsurprisingly under the circumstances, the pro se plaintiff --
who continues to reside in Illinois -- did not appear at the
appointed place and time here in Charleston at Realtime
Reporters.

        One day's notice, when the parties are of diverse and
distant locations, ordinarily cannot be called "reasonable."
Cf. Fed. R. Civ. P. 32(a)(5)(A) (defining a "deposition taken on
short notice" as one taken with "less than 14 days' notice").
Lacking reasonable notice, plaintiff naturally had no
opportunity to be present, much less to cross-examine the
"deponent."  See Fed. R. Civ. P. 32(a)(1)(B).  Accordingly, the
record demonstrates that plaintiff neither had "reasonable
notice" of the deposition, nor was "present or represented," nor
had the opportunity to cross-examine Ms. Reid.  See Fed. R. Civ.
P. 32(a)(1)(A), (C).  Under circumstances such as these, the
sworn statement cannot be used against plaintiff as a
"deposition."

16

C.

Although the sworn statement cannot be used as a deposition, Rule 56 allows for consideration of other materials in the record, explicitly including "affidavits." Fed. R. Civ. P. 56(c)(1). The court finds nothing which requires the term "affidavit[]" to be construed within the narrow limitations of Rule 32(a). See Fed. R. Civ. P. 56(c)(1)(A); see also, e.g., Hoover v. Switlik Parachute Co., 663 F.2d 964, 966-67 (9th Cir. 1981) (treating procedurally deficient deposition as an "affidavit" for purposes of summary judgment motion). Moreover, Rule 56 does not require that anything more than affidavits be submitted in support of a Rule 56 motion. See Fed. R. Civ. P. 56(c)(1)-(4).

Under Rule 56(c), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In other words, an affidavit must present evidence in substantially the same form as if the affiant were testifying in court. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (evidence submitted at summary judgment stage must be admissible and based on personal knowledge); see also Wright & Miller, Federal

17

Practice and Procedure § 2738 (3d ed.).  Consequently, summary

judgment affidavits cannot be conclusory, Rohrbough v. Wyeth

Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990), or based upon

hearsay, conjecture, or supposition, Md. Hwy. Contractors Ass'n

v. Maryland, 933 F.2d 1246, 1251-52 (4th Cir. 1991), cert.

denied, 502 U.S. 939.

        The court would begin by observing that plaintiff's

specific objections were substantially overbroad.  See Reply, p.

2.  For instance, "pages 1-10," which are included in

plaintiff's objections, contain, among other things, Gail Reid's

attestation that she is 60 years old -- surely an admissible

matter about which she is both competent to testify and

personally aware.  Plaintiff "was required to do more than swing

[his] bludgeon wildly."  Perma Research & Dev. Co. v. Singer

Co., 410 F.2d 572, 579 (2d Cir. 1969).

        Turning to plaintiff's substantive arguments, he

claims that the "sworn statement is, in fact, "unsworn."  Strike

Mot., p. 2.  Accordingly, he concludes that it is inadmissible.

Yet, the document is called a "sworn statement," and is

subtitled the "[s]worn statement of Gail Lynette Reid[.]"  Reid

Statement, p. 1.  The first lines of the transcript indicate

that "Gail Lynette Reid, having been first duly sworn to tell

the truth, testified as follows[.]"  Reid Statement, 4:1-3.  On

18

the final page of the transcript, the court reporter
"certif[ies] that the foregoing statement of Gail Lynette Reid
[was] duly taken by me and before me . . . the said witness
having been by me first duly sworn."  Reid Statement, p. 58.
Plaintiff offers no plausible basis for concluding that these
representations are false or mistaken, or that Gail Reid was
unaware of the significance of swearing to testimony.  Curnow,
952 F.2d at 324 (holding that "[t]he district court properly
considered [a witness's unsigned] statement pursuant to Rule
56(c) because her answers to the questions were given under
oath.").

        In addition, as noted, plaintiff objects to the
material on "pages 1-10, 12-18, 21-32, 34-40, 43-46, and 48-57"
of the statement as being outside Gail Reid's personal
knowledge.  Reply, p. 2.  Upon review, it appears that several
sections of the sworn statement are not within Gail Reid's
personal knowledge, or are based on inadmissible hearsay, or
both.  These portions will be disregarded, and the court will
not consider them in ruling on the pending motions for summary
judgment.  See Akin v. Q-L Investments, Inc., 959 F.2d 521, 529-
31 (5th Cir. 1992) (striking offending portions of affidavit but
leaving compliant remainder for consideration); see also 6
Moore, Federal Practice 2817 (2d ed. 1965) ("Even if an

affidavit does contain some inadmissible matter, the whole affidavit need not be stricken or disregarded; the court may disregard the inadmissible parts and consider the rest of the affidavit.").

When the sworn statement is carefully read as a whole, it is evident that many of Gail Reid's statements are within her personal knowledge, as for instance when she recounts the events of June 29 and July 1, 2011, as she remembers them, Reid Statement, 13:9-15:23, 47:6-49:15, or attests that the Barrett Street house was furnished as of June 29, 2011, Reid Statement 9:20-23.  Such testimony would be admissible under the Federal Rules of Evidence, and Gail Reid appears to be competent to provide it.  The admissible portions of the sworn statement satisfy the requirements of an affidavit as set forth in Rule 56(c)(4) and are at least as reliable as statements made in an affidavit, and accordingly the court will consider them as such.

## V. The cross-motions for summary judgement

Plaintiff, in his motion for summary judgment, asserts in somewhat conclusory fashion that he is entitled to judgment as a matter of law on all counts.  The police defendants, in response and in their motion, claim the protection of qualified immunity with respect to plaintiff's section 1983 claims, invoke analogous state law statutory immunity with respect to his

common law assault claim, and maintain that plaintiff fails to state a viable claim for trespass.  For her part, Magistrate Yeager claims the absolute protection of judicial immunity.  She maintains, in the alternative, that plaintiff has not offered evidence of her participation in the conspiracy sufficient to survive summary judgment.

## A.  The police defendants

### 1.  Plaintiff's constitutional claims

Plaintiff alleges that the police defendants "seized and searched [his] house . . . in violation of the Fourth Amendment," and seeks redress under 42 U.S.C. § 1983.  See Compl. ¶¶ 247, 259, 289.  Section 1983 provides, in relevant part, that "[e]very person who . . . causes . . . [a] deprivation of any rights . . . secured by the Constitution and laws[] shall be liable to the party injured."  42 U.S.C. § 1983; see also Hafer v. Melo, 502 U.S. 21, 27 (1991) ("Through [section] 1983, Congress sought 'to give a remedy to parties deprived of constitutional rights, privileges[,] and immunities by a [state] official's abuse of his position.'") (quoting Monroe v. Pape, 365 U.S. 167, 172 (1961)).

As noted, the police defendants claim qualified immunity from plaintiff's section 1983 claims.  Because

qualified immunity is "'an immunity from suit rather than a mere defense to liability,'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)), it is a threshold issue that the court resolves at the outset. Saucier v. Katz, 533 U.S. 194, 200 (2001) ("Where [a] defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.") (receded from on other grounds by Pearson, 555 U.S. 223).

Qualified immunity shields government officials from liability in their individual capacities so long as they do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To overcome the police defendants' assertion of qualified immunity, plaintiff must show (1) that the facts, when viewed in the light most favorable to him, demonstrate the deprivation of a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the deprivation.  Saucier, 533 U.S. at 199.  The court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the

22

circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

a.

The Supreme Court has explained the "clearly established" prong of the qualified immunity inquiry as follows:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  In defining the relevant constitutional question, the court must be specific, for "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. Al-Kidd, 563 U.S. 731, ---, 131 S. Ct. 2074, 2084 (2011).  Once the constitutional question is appropriately defined, the court asks whether existing precedent places the question "beyond debate." Stanton v. Simms, --- U.S. ---, 134 S. Ct. 3, 5 (2013) (per curiam); Creighton, 483 U.S. at 640 (same).  Simply put, "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 577 U.S. ---, 136 S. Ct. 305, 308 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

23

The Fourth Amendment, made applicable to the states by the Fourteenth, Mapp v. Ohio, 367 U.S. 643 (1961), states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  By its terms, the Fourth Amendment protects against both "searches and seizures," and one may be present without the other.  See Presley v. City of Charlottesville, 464 F.3d 480, 484 (4th Cir. 2006).  Likewise, the Fourth Amendment covers both real and personal property, United States v. James Daniel Good Real Prop., 510 U.S. 43, 52 (1993), and applies in the civil context as well as the criminal, Soldal v. Cook Cty., Ill., 506 U.S. 56, 66-67, 67 n. 11 (1992); Nixon v. Montgomery Cty., Md., 251 F. App'x 141, 144-45 (4th Cir. 2007).  A "seizure" of real property occurs when "there is some meaningful interference with an individual's possessory interests in [his] property."  United States v. Jacobsen, 466 U.S. 109, 113 (1984); see also Good Real Prop., 510 U.S. at 53-54 ("The seizure deprived Good of valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents."); Kaiser Aetna v. United States, 444 U.S. 164, 179-80 (1979) (same).  A "search," on the other hand, occurs when the police invade an expectation of privacy in the

24

place or thing searched that society is prepared to recognize as reasonable.  See <u>Jacobsen</u>, 466 U.S. at 113.

Importantly, a search or seizure alone does not constitute a Fourth Amendment violation; rather, only searches and seizures that are "unreasonable" under the circumstances are unlawful.  See <u>United States v. Place</u>, 462 U.S. 696, 703 (1983). Supreme Court precedent establishes that the Fourth Amendment is violated unless the "governmental interests" in effectuating a particular kind of seizure outweigh the "'nature and quality of the intrusion on the individual's Fourth Amendment interests.'" <u>Scott v. Harris</u>, 550 U.S. 372, 383 (2007) (<u>quoting</u> <u>United States v. Place</u>, 462 U.S. 696, 703 (1983)); <u>see</u> <u>also</u> <u>Tennessee v. Garner</u>, 471 U.S. 1, 8 (1985) (There must be a "governmental interes[t]" not only in effectuating a seizure, but also in "how [the seizure] is carried out.").  Similarly, the special protection to be afforded a person's right to privacy within his own home -- the right to the "sanctity of [a] private dwelling" -- is the right "ordinarily afforded the most stringent Fourth Amendment protection."  <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 561 (1976); <u>see</u> <u>also</u> <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980) ("'[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'") (<u>quoting</u> <u>United States v. United States Dist. Ct.</u>,

407 U.S. 297, 313 (1972)).  It is violated when the police
conduct a search in the absence of a warrant, exigent
circumstances, or some other basis making the search reasonable
under the circumstances.  See Kyllo v. United States, 533 U.S.
27, 31 (2001) (citing Illinois v. Rodriguez, 497 U.S. 177, 181
(1990) and Payton, 445 U.S. at 586).

b.

To begin, the "capacity to claim the protection of the
Fourth Amendment depends . . . upon whether the person who
claims the protection . . . has a legitimate expectation of
privacy in the invaded place."  Rakas v. Illinois, 439 U.S. 128,
133-34 (1978).  When examining whether a person has a legitimate
expectation of privacy, the court considers, among other things,
"'whether that person claims an ownership or possessory interest
in the property[] and whether he has established a right[,] or
taken precautions[,] to exclude others from the property.'"
United States v. Castellanos, 716 F.3d 828, 833-34 (4th Cir.
2013) (quoting United States v. Rusher, 966 F.2d 868, 875 (4th
Cir. 1992), cert. denied, 506 U.S. 926).

It appears that plaintiff may have had both a
reasonable expectation of privacy and a cognizable property
interest in the Barrett Street house as of July 1, 2011.
Josephine Patterson had no will when she died.  Patt. Aff. ¶ 5.

26

As a result, her real property, including the Barrett Street house, passed to her four children -- plaintiff, George, Gail, and their sister Alzerita Munlin, who lived in South Carolina, Reid Statement 10:14-15 -- in "equal shares."  See W. Va. Code §§ 42-1-3, 42-1-3a, and 42-1-3d(b)(i) (establishing the procedure for intestate succession); see also § 42-1-2(a) ("Any part of a decedent's estate not effectively disposed of by will passes by intestate succession to the decedent's heirs. . . ."). Further, although plaintiff did not seek permission from any of the Reid group to enter the house on June 29, plaintiff, George, Gail, and Alzerita shared "a mutual right to possession of the [property as a] whole." Eagle Gas Co. v. Doran & Assocs., Inc., 182 W. Va. 194, 198 (1989); see also Bergin & Haskell, Estates in Land and Future Interests, Preface, p. 54 (2d ed. 1984) (observing that "[t]he central characteristic of a tenancy in common is simply that each tenant is deemed to own, by himself, with most of the attributes of independent ownership, a physically undivided part of the entire parcel").  Finally, by July 1, 2011, plaintiff had been living in the house for two days and nights.  Cf. Minnesota v. Olson, 495 U.S. 91, 95-96 (1990) (conferring a reasonable expectation of privacy on overnight guests).  His presence there is tainted only by the fact that he gained possession by persuading the police that he was entitled to occupy the house to the exclusion of the Reid

group.  The police ousted the Reid group but allowed the
Patterson group to enter and remain.  Once installed in the
house, though, plaintiff's legitimate property interest in the
premises appears to have been accompanied by a reasonable
expectation of privacy.

c.

It is clearly established that the police violate the
Fourth Amendment when they remove a cotenant from jointly owned
premises without a reasonable basis for doing so.  See Soldal,
506 U.S. at 61, 71; see also Thomas v. Cohen, 304 F.3d 563, 574
(6th Cir. 2002) ("Forcible eviction . . . is by its very nature
a meaningful interference with [a person's] property interests
and is therefore . . . a deprivation of [his] constitutional
rights when carried out by law enforcement officers in the
absence of a legal basis for doing so.").  The question is
whether the police defendants had a reasonable basis for
entering the Barrett Street house two days later, on July 1,
2011, without a warrant and ejecting plaintiff by threat of
force.

It was not until then that the police made any serious
effort to inform themselves of the circumstances surrounding the
Patterson group's occupation of the Barrett Street house two
days earlier.  Specifically, at some point on July 1, Lieutenant

28

Yeager, who had not been on duty on June 29 or 30, placed a
telephone call to the Kanawha County Magistrate Court, as set
forth above.  See Lt. Yeager's Supp. Resp., Resp. # 11 (showing
the dates Lieutenant Yeager was on duty); Mag. Yeager Dep.
24:15-20 (stating that Lieutenant Yeager telephoned the Kanawha
County Magistrate Court on July 1, 2011, and spoke with
Magistrate Yeager).  During the conversation, Lieutenant Yeager
asked Magistrate Yeager whether the magistrate court had any
record that "there was a wrongful occupation order or a domestic
violence protective order that had been entered that would have
removed individuals from th[e] property."  Mag. Yeager Dep.
24:3-6.  When Lieutenant Yeager mentioned the names of plaintiff
and George in connection with his inquiry, Magistrate Yeager
"recognized [plaintiff's] name" and told Lieutenant Yeager "that
[she] had met [plaintiff] a couple nights prior to [sic] and
that [she] had given [plaintiff] the information with respect to
the fiduciary commissioner's office and how to file for the
estate, to head the estate."  Mag. Yeager Dep. 28:4-21.
Magistrate Yeager is claimed to have added, in apparent
reference to plaintiff, that "he should not be in that house."
See Reid Statement 18:22-24.

     In the absence of exigent circumstances, adherence to
the Fourth Amendment would dictate that the police make a

reasonable investigation before removing plaintiff.  Indeed, it would seem that the other policemen who had escorted plaintiff into the home on June 29 and ousted the Reid group ought to have left that eviction for determination by a court of law.  Though the matter is in some dispute, there is little indication that the Reid group, at the time it was removed, was engaged in a breach of the peace or other misconduct warranting arrest.  The question remains as to whether plaintiff himself may have deceived or misled the police when eliciting their aid in obtaining possession of the house in the first instance.

The police defendants assert that "[i]t would have been unwise for [the other policemen] to leave [Danaya and the others] at the mercy of the plaintiff in light of complaints of physical abuse."  Def. Mem., p. 12.  If so, was the proper remedy one that allowed the perpetrator of the alleged complaints to remain while ousting the allegedly innocent victims?

It is not clear whether the police defendants were aware of the alleged violent acts by the plaintiff that allegedly occurred on June 29, 2011.  Lieutenant Yeager has stated that he "does not recall having any meeting, discussions, talks, and communication" on July 1, 2011, with Officer Lindell or any other officer present at the house on June 29, each of

30

whom presumably knew about the allegations of domestic violence. See Lt. Yeager Supp. Resp., Resp. # 12.  Jaime also testified that she found it strange that the police had simply "changed their minds" about who was entitled to possess or occupy the Barrett Street house.  See Adkins Letter, p. 3 ("I thought it was really strange how they simply changed their mind[s] and were going to let us back in. . . ."). Whatever the reason for the police defendants' decision, apparently it was not explained.

Once plaintiff, together with his son Eros and his brother George, had been installed in the house by the police, the police defendants ought to have considered, in the absence of exigent circumstances, letting the matter take its natural course through the judicial process.  Instead, they apparently concluded that they should rectify the previous ouster of the Reid group by removing the plaintiff and his son and brother so that the Reid group could reoccupy the house.

The inconsistencies, unanswered questions, and gaps in the record prevent the court from being able to rule objectively on the police defendants' assertion of qualified immunity.  To be sure, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Al-Kidd, 131 S. Ct. at 2085.  However,

the record is insufficient to permit a conclusion as to whether
the police defendants' conduct on July 1, 2011, was reasonable
and in keeping with the strictures of the Fourth Amendment.
Because the record does not permit the court to rule objectively
on the question of qualified immunity, neither can the court
conclude that the police defendants are entitled to qualified
immunity as to plaintiff's conspiracy claims.  Consequently,
summary judgment on the basis of qualified immunity is
inappropriate.

### 2. Plaintiff's official capacity claims

The second amended complaint appears to contain claims
against the police defendants in their official capacities.
See, e.g., Compl. ¶¶ 9, 10, 13.  However, as discussed more
fully below, plaintiff's official capacity claims find no
support in the record.

Section 1983 provides a cause of action to an
individual whose constitutional or federal statutory rights have
been violated by a "person" acting under the purported authority
of one of the sovereign states.  See 42 U.S.C. § 1983.  A
state's political subdivisions, including municipalities and
other units of local government, are considered "persons" under
section 1983.  Monell v. Dep't of Soc. Servs. of the City of New
York, 436 U.S. 658, 690 (1978).  In Kentucky v. Graham, 473 U.S.

159 (1985), the Supreme Court observed that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Id. at 165-66. Suits against government officials in their official capacities therefore should be treated as suits against the government. Id. at 166.

Because the real party-in-interest in an official capacity suit is the governmental entity and not the named official, "the entity's 'polic[ies] or custom[s]' must have played a part in the violation of federal law." Id. (citing Monell, 436 U.S. at 690 n. 55). Consequently, although local governments are amenable to suit under section 1983, they cannot be held vicariously liable. Monell, 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."). A local government instead faces liability under section 1983 when:

> [E]xecution of [the] government's policy or custom,
> whether made by its lawmakers or by those whose edicts
> or acts may fairly be said to represent official policy,
> inflicts the injury[.]

Id.; see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 403-04 (1997) (same).

Here, the second amended complaint contains numerous allegations that the police defendants acted pursuant to

33

official policies or customs of the City of South Charleston.
See Compl. ¶¶ 9, 10, 13 ("Each [d]efendant . . . was probably
acting pursuant to the official policy, practice, or custom of
the SCPD and the City of South Charleston."); Compl. ¶ 133
("[T]he police officers appeared to be unsupervised, not
properly trained, negligent and incompetent[.]"); Compl. ¶ 143
(The "defendant police officials . . . were not properly trained
by the City, and were apparently not being unswervingly
compelled by the City to comply with the basic constitutional
laws[.]").  Yet plaintiff has pointed to no evidence in the
record regarding the policies, procedures, customs, or practices
of the City of South Charleston, unconstitutional or otherwise.
In the absence of any evidence on this issue, no reasonable jury
could find in plaintiff's favor.  Accordingly, the police
defendants are entitled to judgment as a matter of law on
plaintiff's official capacity claims.

### 3. Plaintiff's state law claims

        In addition to the constitutional claims discussed
above, plaintiff charges the police defendants with committing
common law trespass, and charges Lieutenant Yeager alone with
common law assault.[1]

_____

1  In plaintiff's briefing, he makes repeated reference to the
tort of conversion, although no claim for conversion appears in

### a. Common law trespass[2]

The common law tort of trespass to property consists in "ent[ering] on another['s] ground without lawful authority[] and doing some damage, however inconsiderable, to his real property."  <u>Whiteman v. Chesapeake Appalachia, LLC</u>, 729 F.3d 381, 386 (4th Cir. 2013) (citing <u>Hark v. Mountain Fork Lumber Co.</u>, 127 W. Va. 586, 591-92 (1945)).  The requisite damage may be physical, or it may be abstract, in the form of an "interfere[nce] with the [plaintiff's] use of his real

---

the reformed second amended complaint.  To be clear, conversion may not be asserted with respect to real property, except in limited circumstances not present here.  <u>See</u> <u>Denke v. Mamola</u>, 437 N.W.2d 205, 207 (S. Dakota 1989) (citing 18 Am. Jur. 2d, <u>Conversion</u> § 19, at p. 156 (1985)); <u>see also</u> Restatement (Second) of Torts § 223 (1965) (same).  Plaintiff does not, for instance, allege that the dwelling at issue has been "severed and removed from the real estate."  <u>Denke</u>, 437 N.W.2d at 207.  Of more immediate significance, perhaps, plaintiff's conversion claims were conclusively rejected as a matter of law in an earlier order of the court.  <u>See</u> March 29, 2013, Memorandum Opinion and Order, at pp. 10-11.  They retain no vitality at this stage, and hence require no further discussion.

2  The police defendants argue that plaintiff's trespass claim is not actionable under section 1983.  <u>See</u> Def. Mem., pp. 13-14.  West Virginia permits a plaintiff who has asserted a section 1983 claim against a law enforcement officer to pursue an independent claim for assault, battery, or other common law intentional torts as well, even if those claims arise from the same facts as the section 1983 claim.  <u>Neiswonger v. Hennessey</u>, 215 W. Va. 749, 753 (2004). Inasmuch as the court finds that plaintiff's trespass causes of action seek to hold the police defendants liable under the common law and not under section 1983, summary judgment on that basis is inappropriate.

property." <u>Hark</u>, 127 W. Va. at 592; <u>see also</u> <u>Rhodes v. E.I. du</u>
<u>Pont de Nemours and Co.</u>, 636 F.3d 88, 94 (4th Cir. 2011) (same).

Nobody disputes that the police defendants physically
entered onto the Barrett Street property, and it is clear, as
discussed above, that plaintiff had a legally cognizable
interest in the Barrett Street house.   The undisputed entry
interfered with his use of the property inasmuch as it resulted
in his being summarily ejected.   <u>See</u> <u>Good Real Prop.</u>, 510 U.S.
at 53-54.   Nevertheless, the police defendants assert that they
had lawful authority to enter the premises.   First, they claim
that plaintiff consented on June 29 to their later entry on July
1.   <u>See</u> Def. Mem., p. 14.   The police defendants also claim, in
the alternative, that they had consent to enter from Gail Reid.
<u>See</u> Def. Mem., pp. 14-15.

It's true that consent, when given by a person with
the power to do so, is one source of lawful authority to enter
private property.   <u>See</u> <u>Perrine v. E.I. du Pont de Nemours and</u>
<u>Co.</u>, 225 W. Va. 482, 513 (2010) (<u>citing</u> Restatement (Second) of
Torts § 892A(1) (1979)); <u>see also</u> <u>Patrick v. PHH Mortg. Corp.</u>,
2013 U.S. Dist. LEXIS 43468, at *15 (N.D. W. Va. Mar. 27, 2013)
(Groh, J.) ("If an owner has consented to an alleged trespass
[he] cannot recover . . . for the harm resulting from [the
alleged trespass].") (<u>citing</u> <u>Perrine</u>, 225 W. Va. at 513).

Nonetheless, the police defendants' argument that plaintiff impliedly consented on June 29 to the entry two days later on July 1 is doubtful. If, however, plaintiff is shown to have deceived the police officers on June 29 into falsely believing that his right of possession was superior to that of co-tenant Gail Reid and that the Reid group were trespassers who should be ejected and replaced by plaintiff and his brother, the original consent so given by him for entry by the police may be deemed to have continued until a just resolution of the right to possession was achieved. <u>See</u> Reid Statement 17:20-18:17 (claiming that plaintiff used a "false power of attorney" to convince the police on June 29 of his superior right of possession).

Turning to the police defendants' second argument, it appears to be the case in West Virginia that one co-owner cannot consent to an entry that injures or encroaches upon the possessory rights of another co-owner. <u>See</u> <u>Provident Life & Trust Co. v. Wood</u>, 96 W. Va. 516, ---, 123 S.E. 276, 281-82 (W. Va. 1924) (A cotenant has no right, without the consent of the other co-owner, to cut and remove the timber growing upon a large area owned in common); <u>Smith v. United Fuel Gas Co.</u>, 113 W. Va. 178, ---, 166 S.E. 533, 534-35 (W. Va. 1932) (Where one or more joint tenants extract natural gas from the common

37

property without the consent of the other joint tenants, waste
of the common property is thereby committed, and he or they may
be compelled to account therefor to the other joint tenants.).
After all, "the gist of the tort [of trespass] is intentional
interference with rights of exclusive possession[.]"  Dan Dobbs
et al., 5A Dobbs' Law of Torts § 49 (2d ed.).

     Because the police are involved here, and are alleged
to have committed constitutional violations during their alleged
trespass, the court finds it meet to look to Fourth Amendment
jurisprudence in considering plaintiff's trespass claims.  In
the Fourth Amendment context, the consent of one co-tenant is
valid as against an absent, non-objecting co-tenant.  United
States v. Matlock, 415 U.S. 164, 170-72 (1974).  On the other
hand, a present co-tenant may object, even if another co-tenant
consents, and the objecting cotenant will prevail.  Georgia v.
Randolph, 547 U.S. 103, 122-23 (2006).

     It is apparent that plaintiff was not an "absent" co-
tenant during the relevant period.  Although he may not have
been present when Gail consented to the police entering the
premises, he obviously was present when the police entered the
house and removed him.

     Accordingly, the police defendants' second argument is
unavailing, though the issue of consent raised by their first

argument persists and requires factual resolution at trial.
Summary judgment on the common law trespass claim is
inappropriate.

### b. Common law assault

In West Virginia, a person is subject to liability for
assault if:

> (a) he acts intending to cause a harmful or offensive
> contact with the person of the other or a third person,
> or an imminent apprehension of such a contact, and (b)
> the other is thereby put in such imminent apprehension.

W. Va. Fire & Cas. Co. v. Stanley, 216 W. Va. 40, 51 (2004)
(quoting Restatement (Second) of Torts § 21 (1965)); see also
State v. Cunningham, 160 W. Va. 582, 593 (1977) (Miller, J.,
dissenting) (observing, in the criminal context, that "[a]n
assault is, of course, the threat to do violence as
distinguished from the actual doing of violence, which is a
battery."); Hutchinson v. W. Va. State Police, 731 F. Supp. 2d
521, 547 (S.D. W. Va. 2010) (Chambers, J.) ("Stated simply, an
assault occurs when one person puts another in reasonable fear
or apprehension of an imminent battery and battery is any
harmful or offensive contact."), aff'd sub nom. Hutchinson v.
Lemmon, 436 F. App'x 210 (4th Cir. 2011).  On the other hand,
the police may be entitled to commit what would otherwise be an
assault in the legitimate exercise of their authority.

39

Hutchinson, 731 F. Supp. 2d at 547 ("An activity that would otherwise subject a person to liability in tort for assault and battery . . . does not constitute tortious conduct if the actor is privileged to engage in such conduct.").

Here, plaintiff alleges that Lieutenant Yeager threatened him with injury and "caused [him] to be in imminent fear for his life[, and to] fear . . . bodily injury." Compl. ¶ 693. In support of these allegations, plaintiff has testified that Lieutenant Yeager threatened to pepper spray him, Patt. Aff. ¶¶ 36, 39, and that he was frightened. See Patt. Dep. 54:1-2 ("I was afraid of him."), 54:6-9 ("[W]hen he put his hand on that gun, I was really afraid.").

Lieutenant Yeager has not disputed plaintiff's testimony. Instead, he invokes the protection of West Virginia statutory immunity for government officials. The statute in question provides as follows:

> (b)  An employee of a political subdivision is immune from liability unless one of the following applies:
>
> (1)  His or her acts or omissions were manifestly outside the scope of employment or official responsibilities;
>
> (2)  His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or

> (3)  Liability is expressly imposed upon the employee by
>       a provision of this code.

W. Va. Code § 29-12A-5(b).

The parties appear to agree that Lieutenant Yeager, as a South Charleston police officer, is an "employee of a political subdivision."  There is no claim that liability is expressly imposed on Lieutenant Yeager by a provision of the West Virginia Code.  Thus, the question is whether his acts were manifestly outside the scope of his duties or malicious, wanton, or reckless.

As discussed above in reference to plaintiff's section 1983 claims, the record precludes an objective analysis of the reasonableness of the police defendants' conduct, including that of Lieutenant Yeager.  This is in large part because the police defendants have not explained why they believed it was necessary to remove plaintiff from the house, or to threaten to use force in doing so.  Because it is unclear whether their decision to do so was based on a reasonable investigation, it is not possible to determine whether Lieutenant Yeager's particular conduct at issue -- threatening to pepper spray plaintiff -- was within the scope of his duties and not reckless, malicious, or in bad faith, or manifestly beyond the scope of his duties.  If the entire action was unreasonable, any use of force to support it

41

would be unreasonable, too.  In the absence of sufficient factual matter to rule on the question objectively, Lieutenant Yeager's motion for summary judgment on plaintiff's common law assault claim must be denied.

## B. Magistrate Yeager

The complaint alleges that Magistrate Yeager joined the police defendants, particularly her brother Lieutenant Yeager, in a conspiracy to violate plaintiff's constitutional rights.  See Compl. ¶¶ 619-21.  Specifically, plaintiff claims that "[a]t the 3:00 p.m. meeting [on July 1, 2011] at the [South Charleston] police station, Jaime Adkins, Lieutenant Yeager, [Magistrate] Yeager, [and the other defendants] likely hatched a plan to dispossess and humiliate [plaintiff]," Compl. ¶ 114, and that Magistrate Yeager "appeared to advise [the police defendants]" in their scheme, Compl. ¶ 122.

In response, Magistrate Yeager invokes the protection of absolute judicial immunity, asserting that her actions were at all relevant times "clearly judicial and within the duties and jurisdiction of a [state] magistrate."  Mag. Yeager Mot., p. 2.  In the alternative, Magistrate Yeager maintains that plaintiff has failed to produce sufficient evidence of her participation in the conspiracy, and that she is therefore

42

entitled to judgment as a matter of law.  Mag. Yeager Mem., pp.
17-18.

### 1. <u>Judicial immunity</u>

#### a.

Judicial immunity is an absolute defense to suit,
<u>Stump v. Sparkman</u>, 435 U.S. 349, 356 (1978), so long as the
judge's alleged wrongful conduct was "performed in [the judge's]
judicial capacit[y]," <u>Supreme Court of Virginia v. Consumers
Union</u>, 446 U.S. 719, 734-35 (1980).  The scope of judicial
immunity is broad indeed, for it reaches judges of "both
superior and inferior courts," <u>King v. Myers</u>, 973 F.2d 354, 356
(4th Cir. 1992), and applies even to serious misconduct such as
bribery, <u>Mireles v. Waco</u>, 502 U.S. 9, 11 (1991), and corruption,
<u>Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980).

Even so, the Supreme Court has recognized that
"[a]bsolute immunity . . . is 'strong medicine, justified only
when the danger of [officials' being] deflect[ed] from the
effective performance of their duties] is very great.'"
<u>Forrester v. White</u>, 484 U.S. 219, 230 (1988) (<u>quoting</u> <u>Forrester
v. White</u>, 792 F.2d 647, 660 (7th Cir. 1986) (Posner, J.,
dissenting)).  Consequently, the inquiry focuses upon the nature

of the act in question rather than the identity of the actor.
The Supreme Court has explained as follows:

> Whether the act done by [the judge] was judicial or not
> is to be determined by its character, and not by the
> character of the agent.  Whether he was a county judge
> or not is of no importance.  The duty of selecting jurors
> might as well have been committed to a private person as
> to one holding the office of a judge. . . .  That the
> jurors are selected for a court makes no difference.  So
> are court criers, tipstaves, sheriffs, [et cetera].  Is
> their election or their appointment a judicial act?

Forrester, 484 U.S. at 228 (quoting Ex parte Virginia, 100 U.S.
(10 Otto) 339 (1889)).  In other words, it is a judge's "truly
judicial acts" which afford judicial immunity, not those acts
that are administrative, legislative, or executive, or simply
ordinary.  Id. at 227-28 ("Administrative decisions, even though
they may be essential to the very functioning of the courts,"
are not regarded as truly judicial acts.).  In determining
whether a given act is "truly judicial," the court must examine
whether the act "is a function normally performed by a judge,
[as well as] the expectation of the parties[;] i.e., whether
they dealt with the judge in his judicial capacity."  Stump, 435
U.S. at 362.

b.

It is undisputed that Magistrate Yeager spoke on the telephone with Lieutenant Yeager about plaintiff at some point on July 1, 2011.  As discussed more comprehensively in the next subsection below, the record is devoid of any evidence upon which a reasonable jury could conclude that Magistrate Yeager and Lieutenant Yeager (or any other police defendant) met in person between June 29 and July 1, 2011.  Consequently, for purposes of determining the applicability of absolute judicial immunity to Magistrate Yeager's conduct during the relevant period, the court confines its inquiry to the July 1, 2011, telephone call.

Lieutenant Yeager called the magistrate court to see whether "there were any orders that would have removed anyone from the [Barrett Street] residence."  Mag. Yeager Dep. 23:22-24:20.  Magistrate Yeager also "mentioned to Lieutenant Yeager that [she] had met [plaintiff] a couple nights prior to [sic] and that [she] had given [plaintiff] the information with respect to the fiduciary commissioner's office and how to file for the [administration of Josephine Patterson's] estate."  Mag. Yeager Dep. 28:17-21.  Gail Reid stated that while she was meeting with Lieutenant Yeager on July 1, Lieutenant Yeager "happened to call up the magistrate's office."  Reid Statement

18:19-20.  Gail recalled that the magistrate with whom
Lieutenant Yeager spoke -- "a lady" -- said of plaintiff, "'I
told him the night he came up here that he had no standing. And
he should not be in that house.'"  Reid Statement 18:22-24.

The Supreme Court's decision in <u>Forrester</u> is of some
aid in evaluating the nature of Magistrate Yeager's acts here.
There the Court declined to extend judicial immunity to Judge
Howard Lee White, an Illinois state court judge, in a suit
brought against him under section 1983 for his demotion and
discharge of Forrester, a probation officer.  The Supreme Court
concluded that Judge White was acting in an administrative
capacity, rather than a judicial one, when he demoted and
dismissed Forrester, reasoning that "[t]he decisions at issue
. . . were not themselves judicial or adjudicative."  484 U.S.
at 227.  As a result, the Court treated Judge White as it would
any other employer being subjected to suit under section 1983.

The act of checking whether an order has been entered,
like the hiring of a subordinate member of the clerk's office,
might as well be done by a non-judicial employee of the
magistrate court as by a judge or magistrate.  Indeed,
Magistrate Yeager explained that "when you're in that day court
area, it's so crazy, just whoever can grab it grabs the phone"
when someone calls.  Mag. Yeager Dep. 27:10-12.  It is not clear

46

that some other court employee could not have answered the phone and checked the court's records for orders pertaining to the Barrett Street house.  On the other hand, it is clear that Magistrate Yeager's volunteered statements about plaintiff's visit were not made in her judicial capacity, as it is not one of the functions of a judge to volunteer information to the police.  Magistrate Yeager's conduct, even as she describes it, was not "adjudicative," but rather was administrative or ministerial at best.  Accordingly, Magistrate Yeager is not entitled to summary judgment on the basis of absolute judicial immunity.

### 2. Entitlement to judgment as a matter of law

Although Magistrate Yeager is not entitled to judicial immunity under the circumstances, she is entitled to judgment as a matter of law on plaintiff's conspiracy claim withal, as the record is insufficient for a reasonable jury to find that she entered into a conspiracy with the police defendants to deprive plaintiff of his constitutional rights.

### a.

A civil conspiracy is "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful

means." Syl. Pt. 8, <u>Dunn v. Rockwell</u>, 225 W. Va. 43 (2009).
"The cause of action is not created by the conspiracy but by the
wrongful acts done by the defendants to the injury of the
plaintiff." <u>Id.</u>

        In the context of a section 1983 action, a plaintiff
alleging a conspiracy to violate his constitutional rights "must
present evidence that the defendants <u>acted jointly in concert</u>
and that some overt act was done in furtherance of the
conspiracy which resulted in [the] deprivation of a
constitutional right." <u>Hinckle v. City of Clarksburg</u>, 81 F.3d
416, 421 (4th Cir. 1996) (emphasis supplied); <u>see also Hafner v.
Brown</u>, 983 F.2d 570, 577 (4th Cir. 1992) (same). Plaintiff
consequently has a "heavy burden to establish a civil rights
conspiracy," for while he "need not produce direct evidence of a
meeting of the minds, [he] must come forward with specific
circumstantial evidence that each member of the alleged
conspiracy shared the same conspiratorial objective." <u>Hinkle</u>,
81 F.3d at 421. In other words, to survive a properly supported
summary judgment motion, plaintiff's evidence must, at least,
reasonably lead to the inference that the defendants positively
or tacitly came to a mutual understanding to try to accomplish a
common and unlawful plan. <u>See Hafner</u>, 983 F.2d at 576–77; <u>see
also Abercrombie v. City of Catoosa, Okl.</u>, 896 F.2d 1228, 1230–

31 (10th Cir. 1990) (same); <u>Fonda v. Gray</u>, 707 F.2d 435, 438
(9th Cir. 1983) (same).

b.

Plaintiff initially claimed that the alleged
conspiracy was formed at the South Charleston police station
during a meeting attended by Jamie Adkins, Lieutenant Yeager,
Magistrate Yeager, Sergeant Thomas, and Officer McFarland.
Compl. ¶ 114.  These allegations appear to be based on a letter
written by Jamie Adkins on or around July 2, 2011, which
plaintiff obtained during discovery on the first amended
complaint.  <u>See</u> Adkins Letter, Compl., Ex. 1.

It is undisputed that at least one meeting occurred at
the station on July 1.  <u>See</u> Lt. Yeager Supp. Resp., p. 9.
However, there is simply no evidence whatsoever in the record
that Magistrate Yeager attended.  Nevertheless, plaintiff has
adopted an alternative theory of Magistrate Yeager's rôle in the
conspiracy -- that she met with Lieutenant Yeager at the
Magistrate Court on July 1, 2011, while he was on duty.  In
support of this alternate theory, plaintiff points to a
reference in Lieutenant Yeager's police logs to a code "44,"
which plaintiff believes to be code for "permission to leave
patrol."  <u>See</u> Compl. ¶ 58.  Lieutenant Yeager's July 1, 2011,
police log states, verbatim, "HQ TO BARRETT ST, PROP. DISP. 44

49

TO MAG. CT." See Compl., Ex. 13.  From this, plaintiff deduces
that Lieutenant Yeager must have asked for permission to leave
patrol to go to the magistrate court, whereupon he and
Magistrate Yeager conspired.  Compl. ¶¶ 58, 63, 64.  But
plaintiff does not present any evidence to counter Magistrate
Yeager's testimony that she never met Lieutenant Yeager in
person at the courthouse on July 1, 2011.  See Mag. Yeager Dep.
49:17-50:3 ("I don't recall him at the courthouse.").  Nor does
plaintiff offer evidence to contradict Lieutenant Yeager's
statement in his December 1, 2015, affidavit that "[c]learance
code '44' is the designation that an individual was referred to
another agency," and that "[i]n this instance, the clearance
code '44' was used to denote that the individuals involved in
the property dispute were referred to the Kanawha County
Magistrate Court."  Lieutenant Yeager Aff. ¶¶ 5-6.  There is
thus no evidence in the record that Lieutenant Yeager and
Magistrate Yeager met in person, either at the police station or
the magistrate court, during the relevant time period.

        Plaintiff offers still another theory -- namely,
that the conspiracy occurred during Lieutenant Yeager's July 1
phone call to the magistrate court.  As already discussed, it is
undisputed that during the call Lieutenant Yeager asked
Magistrate Yeager whether the magistrate court had any record of

an order respecting the ownership or possession of the Barrett
Street house.  Mag. Yeager Dep. 24:2-20.  During the call,
Lieutenant Yeager mentioned plaintiff's name.  Mag. Yeager Dep.
24:20-25, 28:10-16.  This prompted Magistrate Yeager to tell
Lieutenant Yeager that plaintiff had come to the magistrate
court on June 29, 2011, while Magistrate Yeager was on duty, and
had spoken with her about the Barrett Street house.  Mag. Yeager
Dep. 28:17-23.  Although Magistrate Yeager's statement that
plaintiff "should not be in that house" may have emboldened
Lieutenant Yeager to remove plaintiff, it was not conspiratorial
in nature.  The record is clear that Magistrate Yeager did not
learn that plaintiff had been removed from the Barrett Street
house, or that her brother Lieutenant Yeager had effected the
removal, until plaintiff's arraignment on domestic battery
charges in Magistrate Yeager's court on July 2, 2011.  See Mag.
Yeager Dep. 45:13-46:4.

          The court is mindful of the fact that plaintiff need
produce no more than "circumstantial evidence that each member
of the conspiracy shared the same conspiratorial objective," and
that "direct evidence of a meeting of the minds" is not
required.  Hinkle, 81 F.3d at 421.  It is also mindful that it
must view the facts in the light most favorable to plaintiff and
resolve all inconsistencies in his favor.  Diebold, 369 U.S. at

655; Charbonnages de France, 597 F.2d at 414.  Nevertheless,
there is no evidence in the record upon which a reasonable jury
could base a finding of "common purpose" or a "meeting of the
minds" between Magistrate Yeager and any of the police
defendants.  Simply because they briefly talked on the telephone
on July 1, 2011, about plaintiff's visit to the magistrate
court, plaintiff asks the court to find a reasonable inference
that Magistrate Yeager and Lieutenant Yeager shared a common
conspiratorial objective.  But with only the phone call to
support it, such an inference would be unreasonable.  Conspiracy
"is a legal doctrine under which liability is imposed on people
who did not actually commit a tort themselves but who shared a
common plan for its commission with the actual perpetrator(s)."
Syl. Pt. 9, Dunn v. Rockwell, 225 W. Va. 43.  There is no
evidence of a common plan here.

     "[T]he law is well settled that merely conclusory
allegations of conspiracy, unsupported by a factual showing of
participation in a joint plan of action" are insufficient as a
matter of law to preclude summary judgment.  Simmons v. Poe, 47
F.3d 1370, 1376 (4th Cir. 1995).  Rule 56 mandates the entry of
summary judgment against a party who fails to make a showing
sufficient to establish the existence of an essential element
for which that party bears the burden of proof at trial.  Fed.

R. Civ. P. 56(a).  In order to do so, "a party must present more than mere speculation or conjecture."  Sybron Transition Corp. v. Security Ins. Co. of Hartford, 107 F.3d 1250, 1255 (7th Cir. 1997).  Plaintiff's failure to offer any evidence of Magistrate Yeager's misconduct, beyond his own supposition, is sufficient basis for entry of summary judgment against him on this claim. Accordingly, Magistrate Yeager is entitled to judgment as a matter of law, and plaintiff's motion for summary judgment as to her must be denied.

## VI. Conclusion

For the foregoing reasons, it is ORDERED as follows:

1. That the motion to strike filed by plaintiff Wayne Patterson on December 21, 2015, be, and it hereby is, granted in part, as set forth above, but otherwise denied;

2. That the motion for summary judgment filed jointly by defendants Lieutenant R.T. Yeager, Sergeant L.S. Thomas, and Officer R.P. McFarland on December 12, 2015, be, and it hereby is, granted with respect to plaintiff's official capacity claims under 42 U.S.C. § 1983, as set forth above, but otherwise denied;

3. That the motion for summary judgment filed by defendant Magistrate Julie Yeager on December 12, 2015, be, and it hereby is, granted; and,

4. That the motion for summary judgment filed by plaintiff on December 13, 2015, be, and it hereby is, denied.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

DATED: February 11, 2016

John T. Copenhaver, Jr.
United States District Judge